UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DARLA S. LITAKER,

        Plaintiff,

  v.

QWEST CORPORATION,

        Defendant.

No. C04-2069P

ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE

    Defendant Qwest Corporation has moved for summary judgment (Dkt. No. 11) in this disability discrimination case. Defendant has also moved to strike evidence offered by Plaintiff in opposition to the summary judgment motion. Having considered the papers and pleadings submitted by the parties and having heard oral argument, the Court hereby DENIES Defendant's motion for summary judgment and DENIES Defendant's motion to strike for the reasons set forth below.

**Background**

    In June 1997, Plaintiff Darla Litaker started working for Qwest as a network technician in Tacoma. In January 2001, she was diagnosed with bipolar disorder. On June 5, 2001, she was terminated after failing to report to work. Plaintiff alleges two claims against Defendant: (1) failure to accommodate; and (2) wrongful termination/disparate treatment. Both claims are brought under Washington state law.

    This case largely concerns events that occurred in the first six months of 2001. Shortly after her bipolar diagnosis in January 2001, Plaintiff went on Family and Medical Leave Act (FMLA) leave

ORDER - 1

for about a month. In connection with this FMLA leave, Plaintiff's counselor Pamela Elderkin completed a disability medical certificate form. See Declaration of Jill Hawkins ("Hawkins Decl"), Ex. 4. On this certificate, Ms. Elderkin noted Plaintiff's bipolar diagnosis and indicated that Plaintiff needed to "stabilize and balance herself and deal with overwhelming grief." Id. Among other things, Ms. Elderkin indicated that both of Plaintiff's parents had died and her thirteen-year old daughter had chosen to live in North Carolina with her ex-husband, resulting in "too much grief and loss" for Plaintiff to process. Id.

Plaintiff returned to work on March 1, 2001. Plaintiff states that on that date, she met with her supervisor Steve Birchler and made him aware of her condition and her medications. See Declaration of Darla Litaker ("Litaker Decl.") ¶ 10. She also told at least one of her co-workers at a breakfast meeting that day that she was "in counseling and taking drugs" and described her illness and its effects in some detail. Id. ¶ 9.

A few days after returning to work, Plaintiff received notice that a hearing would be taking place in North Carolina on March 30, 2001 in a child custody dispute between Plaintiff and her ex-husband regarding their daughter. Plaintiff traveled to North Carolina for about a week in late March/early April 2001 in connection with the child custody matter. Plaintiff used vacation time to cover this absence.

After returning to Washington in early April 2001, Plaintiff received notice that there would be another child custody hearing in North Carolina on May 3, 2001. According to Mr. Birchler, Plaintiff told him on April 17, 2001 that she needed to return to North Carolina for this matter. See Declaration of Steve Birchler ("Birchler Decl.") ¶ 5. Mr. Birchler told Plaintiff that she had no remaining vacation time or paid personal days. Id.

On April 26, 2001, Plaintiff met with Mr. Birchler, Qwest Operations Manager Tom Johnson, and her union president to discuss her request for additional time off work. Id. ¶ 6. Qwest notes that more than a week before this meeting, Ms. Litaker had already bought a plane ticket to North Carolina

ORDER - 2

which had her departing on May 2nd and returning on May 27th.  <u>See</u> Declaration of Linda Walton ("Walton Decl."), Litaker Dep., Ex. 6.  Mr. Johnson allowed Plaintiff one week of excused unpaid time of work from May 2, 2001 to deal with the custody matter, with the expectation that Plaintiff would return to work on May 8, 2001.  Birchler Decl. ¶ 6.

On April 30, 2001, Plaintiff called Mr. Birchler to tell him that she could not come into work; Plaintiff states that she had an anxiety attack so severe that she could not walk to work and was on her "hands and knees, crawling."  (Litaker Decl. ¶ 16).  According to Mr. Birchler, Plaintiff called him the next day (May 1st) to request FMLA forms and she picked up the forms later that afternoon. (Birchler Decl. ¶ 8).

Later on May 1st, counselor Pamela Elderkin signed a FMLA certification form for Plaintiff. (Hawkins Decl., Ex. 7).  Ms. Elderkin indicated that Plaintiff was suffering "anxiety attacks - incapacity to work" and that recovery was expected "June 2001."  <u>Id.</u>  Ms. Elderkin also indicated that plaintiff was temporarily incapacitated from April 23 through May 15th.

Ms. Litaker flew to North Carolina on May 2, 2001.  She remained in North Carolina for the next several weeks, apparently due to some confusion about what she needed to do to finalize the child custody proceedings.  Plaintiff kept in contact with Mr. Birchler with some regularity during this time period.

On May 17, 2001, Tom Johnson sent Plaintiff a letter confirming a voice mail that he had left her that day stating she would be terminated if she did not return to work by May 21.  However, it appears that on May 21st, Qwest's disability administrator received the FMLA certification form that Ms. Elderkin had signed on May 1st.  (Hawkins Decl., Ex. 10).

On May 24, 2001, a physician from Qwest named Anne Hazelton spoke with Ms. Elderkin regarding the FMLA certification form.  (Hawkins Decl., Ex. 9).  Dr. Hazelton's notes from this conversation indicate that Ms. Elderkin said that Plaintiff had "gone to pieces," had not been well enough to work, and had "really decompensated."  Following this conversation, Qwest granted Ms.

ORDER - 3

Litaker FMLA leave for the period of April 23 - May 15 and provisionally granted her additional FMLA leave from May 16 until late May, when her FMLA leave would be exhausted.[1] (Hawkins Decl., Ex. 10).

On May 29, 2001, Plaintiff called Steve Birchler from North Carolina and said that she would be back to work on June 4, 2001. Id. However, on May 31, 2001, Plaintiff called Mr. Birchler again and said that she could not get back by June 4th because of the cost of changing her airplane ticket. Id. In her deposition, Plaintiff testified that the cost of changing her ticket would have been $3,000. See Walton Decl., Litaker Dep. at 83:15-84:3. Mr. Birchler's notes from the May 31st conversation indicated that he told Plaintiff that "we'd deal with attendance problems when she got back." (Hawkins Decl., Ex. 10).

On June 1, 2001, Mr. Birchler sent the following letter to Plaintiff:

> As stated in the letter I sent you dated May 28, 2001, your FMLA entitlements expired May 28, 2001. You no longer have any vacation / PDP [personal days paid] entitlement time remaining. The company is unwilling to grant you a leave of absence.[2] All time after May 28th is considered unexcused, unpaid.
>
> You called me May 29, 2001 and said that you were finished taking care of your personal issues in North Carolina and would return to work on Monday, June 4, 2001.
>
> On May 31, 2001 you called me and stated that you couldn't afford the additional cost of the ticket to fly home earlier from North Carolina. Because of this cost, you were going to keep your scheduled flight and not be able to report for work until Monday, June 11, 2001.
>
> This is unexceptable [sic]. You are to report to your regular work location by 7AM June 5, 2001. Failure to report will result in your termination.
>
> I called and talked to you 6/1/01 at 12:30PM and told you I was sending a fax to your hotel. You confirmed the number. I also sent this letter to your home address.

---

[1] An e-mail written by Qwest human resources employee Caroline Keyser indicated that FMLA had been granted on May 24th "based on conversation with dr. and fact that we really have difficulty denying." (Hawkins Decl., Ex. 10).

[2] In a declaration, Plaintiff asserts that in "April/May 2001" she asked Mr. Birchler for "an unpaid leave of absence in order to heal, to collect myself." (Litaker Decl. ¶ 17).

ORDER - 4

(Hawkins Decl., Ex. 15). Ms. Litaker did not return to work on June 5, 2001, and she was terminated on that day.

Plaintiff filed this lawsuit in state court on June 4, 2004. Defendant subsequently removed the case to this Court.

**Analysis**

Plaintiff's claims are brought under the Washington Law Against Discrimination (WLAD), RCW 49.60 et seq. Washington courts have indicated that "[s]ummary judgment should rarely be granted in employment discrimination cases." Sangster v. Albertson's, Inc., 99 Wn. App. 156, 160, 991 P.2d 674 (2000). "While employers deserve protection from frivolous lawsuits . . . courts must carefully consider all allegations of unlawful discrimination, since the WLAD 'embodies a public policy of the highest priority.'" Hill v. BCTI Income Fund-I, 144 Wn.2d 172, 179, 23 P.3d 440 (2001).

1.   Failure to Accommodate Claim

Plaintiff first alleges that Defendant failed to accommodate her alleged disability in violation of the WLAD. To prevail on a failure to accommodate claim under Washington law, a plaintiff must show four elements:

> (1) the employee had a sensory, mental, or physical abnormality that substantially limited his or her ability to perform the job; (2) the employee was qualified to perform the essential functions of the job in question; (3) the employee gave the employer notice of the abnormality and its accompanying substantial limitations; and (4) upon notice, the employer failed to affirmatively adopt measures that were available to the employer and medically necessary to accommodate the abnormality.

Hines v. Todd Pacific Shipyards Corp, 127 Wn. App. 357, 373, 112 P.3d 522 (2005). Each of these elements is considered below.

a.   Disability

A claimant satisfies the first element of a failure to accommodate claim by showing that "(1) he or she has/had a sensory, mental, or physical abnormality and (2) such abnormality has/had a substantially limiting effect upon the individual's ability to perform his or her job." Pulcino v. Federal

ORDER - 5

Express Corp., 141 Wn.2d 629, 641, 9 P.3d 787 (2000).  Here, Plaintiff has introduced evidence showing that she was diagnosed with bipolar disorder in January 2001.  She has also introduced evidence that this illness had a substantially limiting effect upon her ability to perform her job.  For example, plaintiff's FMLA certification from May 1, 2001 indicated that she was suffering from "anxiety attacks – incapacity to work" and that recovery was expected "June 2001."  Although Qwest disputes that Plaintiff had a disability at the time of her termination, Plaintiff's evidence is sufficient to raise a factual issue as to whether she had a disability that substantially limited her ability to perform her job.

  b.  Qualified to Perform Job

Defendant does not dispute that Plaintiff was qualified to perform the essential functions of her job.

  c.  Notice to Employer

The parties sharply dispute whether Plaintiff provided sufficient notice of her alleged disability to her employer.  Defendant maintains that Plaintiff "gave her employer no notice, whatsoever, that she was suffering from a disabling condition that prevented her from reporting to work as scheduled on June 4, 2001."[3]  (Opening Brief at 15).  Defendant argues that the undisputed evidence shows that Ms. Litaker failed to report for work in early June "for only one reason – she could not afford the airfare from North Carolina to Seattle."  (Reply Brief at 7).

However, Defendant was aware or should have been aware that Plaintiff had been diagnosed as bipolar in January 2001.  In addition, as noted above, Plaintiff submitted a FMLA certification on May 1, 2001 from counselor Pamela Elderkin which stated that Plaintiff was suffering from "anxiety attacks – incapacity to work" and that recovery was expected in "June 2001."  (Hawkins Decl., Ex. 7).

---

[3] Throughout its briefing, Defendant appears to suggest that Plaintiff was supposed to report for work on June 4, 2001.  However, the evidence indicates that Plaintiff was told by Steve Birchler that she needed to report to work on June 5, 2001.  (Hawkins Decl., Ex. 15).

ORDER - 6

Plaintiff has also introduced evidence indicating that a Qwest physician spoke to Ms. Elderkin on May 24, 2001 and that Ms. Elderkin stated that Plaintiff had "gone to pieces," had "not been well enough to go to work," and had "really decompensated." (Hawkins Decl., Ex. 9). Finally, Plaintiff asserts that she asked her supervisor for a leave of absence in "April/May 2001" in order to heal herself, which was denied. (Litaker Decl. ¶ 17).

Washington courts have indicated that "to satisfy the 'notice' element, an employee is not required to tell the employer about the full nature and extent of the disability, only that a disability requiring accommodation exists." Sommer v. Dep't of Social & Health Servs., 104 Wn. App. 160, 173, 15 P.3d 664 (2001). Plaintiff has produced sufficient evidence to raise an issue of material fact on whether she discharged that duty here. Even though there is no evidence that Plaintiff specifically told her employer that she could not report to work on June 5, 2001 because of a disability, Defendant had repeatedly received notice in the preceding months that Plaintiff was suffering from serious mental health problems. Viewing the evidence in the light most favorable to the non-moving party, the Court finds that Plaintiff has made a sufficient showing to allow this issue to go to the jury.

      d.    Accommodation

Finally, Plaintiff must show that her employer failed to affirmatively adopt measures that were available and medically necessary to accommodate her disability. Plaintiff maintains that Defendant could have accommodated her disability by granting her an unpaid leave of absence.[4] While Defendant does not dispute that it could have offered Plaintiff a leave of absence, Defendant maintains that "no evidence exists that it was medically necessary to provide Ms. Litaker with an accommodation that

---

[4] The parties dispute when and how often Plaintiff requested leave(s) of absence, a subject that will be discussed below in considering Defendant's motion to strike. However, the Ninth Circuit has noted that under WLAD "an employee's failure to formally request an accommodation . . . does not absolve the employer of its obligation to reasonably accommodate its employees' disabilities." Kimbro v. Atlantic Richfield Co., 889 F.2d 869, 877 n. 7 (9th Cir. 1989). As such, Plaintiff's failure to accommodate claim does not turn on when or how often she formally requested a leave of absence to accommodate her alleged disability.

ORDER - 7

would have excused her from reporting to work" in early June 2001. (Opening Brief at 15). In particular, Defendant points to Plaintiff's deposition testimony where she indicated that other than the cost of changing her airplane ticket, there was no other reason why she could not report to work on June 4 or 5, 2001. (Walton Decl., Litaker Dep., at 110:17-21).

However, as noted above, counselor Pamela Elderkin indicated on a FMLA form on May 1, 2001 that Plaintiff had been suffering from anxiety attacks and was expected to recover in "June 2001." In addition, Qwest physician Anne Hazelton spoke with Ms. Elderkin on May 24, 2001, and was told that Plaintiff had "gone to pieces," had "not been well enough to go to work," and had "really decompensated." (Hawkins Decl., Ex. 9). Plaintiff's counsel also maintained at oral argument that Plaintiff's pattern of behavior in the weeks before her termination shows symptoms of bipolar disorder. Viewing the evidence in the light most favorable to Plaintiff, the Court finds there are issues of material fact on the question of whether it was medically necessary to provide an accommodation to Plaintiff in early June 2001.

It should also be noted that Washington courts have held that an employer who receives notice of an employee's disability must take "'positive steps' to accommodate the employee's limitations." Goodman v. Boeing Co., 127 Wn.2d 401, 408, 899 P.2d 1265 (1995). In such circumstances, "reasonable accommodation . . . envisions an exchange between employer and employee where each seeks and shares information." Id. Here, Plaintiff disputes that Defendant took such "positive steps" to accommodate her disability.

In addition, the Ninth Circuit has indicated that under the WLAD, "[a]s long as at the time of [plaintiff's] termination there were 'plausible reasons to believe that the handicap [could have been] accommodated' by a leave of absence, [the employer] is responsible for its failure to offer such a leave." Kimbro v. Atlantic Richfield Co., 889 F.2d 869, 878 (9th Cir. 1989). Viewed in the light most favorable to Plaintiff, the evidence provides plausible reasons to believe that Plaintiff's alleged disability could have been accommodated by a leave of absence.

ORDER - 8

     e.     Summary

Although Plaintiff's failure to accommodate claim has some weaknesses, she has offered sufficient evidence to raise genuine issues of material fact on the elements of her claim. Therefore, summary judgment will be denied on this claim.

2.     Wrongful Termination/Disparate Treatment Claim

Plaintiff also maintains that Defendant violated the WLAD by wrongfully terminating her because of her disability. The parties agree that this claim should be treated as a disparate treatment claim. Under the WLAD, it is unlawful for an employer to discharge an employee "because of . . . the presence of any sensory, mental, or physical disability." RCW 49.60.180(2). As Plaintiff notes, a claimant may prevail if her alleged disability was a "substantial factor" in the challenged decision, even if other factors may have contributed to the decision. Mackay v. Acorn Custom Cabinetry, 127 Wn. 2d 302, 210 (1995).

Washington courts apply a three-part framework to analyze disparate treatment claims. The plaintiff bears the initial burden of making a prima facie case of discrimination. If plaintiff makes a prima facie case, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action. If the employer meets this requirement, the burden then shifts to plaintiff to show that the employer's proferred reason is pretextual. Hines v. Todd Pacific Shipyards Corp., 127 Wash. App. 356, 371, 112 P.3d 522 (2005).

Plaintiff's Prima Facie Case

A claimant in a disability discrimination under the WLAD case may make a prima facie case by showing that she was: (1) disabled; (2) subject to an adverse employment action; (3) doing satisfactory work; and (4) discharged under circumstances that raise a reasonable inference of unlawful

ORDER - 9

discrimination.[5] Callahan v. Walla Walla Housing Authority, 126 Wn. App. 812, 819-20, 110 P.3d 782 (2005); Anica v. Wal-Mart Stores, Inc., 120 Wn. App. 481, 488, 84 P.3d 1231 (2004).

### a. Disabled

As discussed above, Plaintiff has produced sufficient evidence to raise a factual issue on this element.

### b. Adverse Action

There is no dispute Plaintiff was subjected to an adverse employment action when she was terminated by Defendant.

### c. Satisfactory Work

Defendant argues that Plaintiff "can produce no evidence demonstrating that at the time of her discharge she was doing the work of Network Technician to the satisfaction of her employer," since she was not working at all. (Opening Brief at 13). Plaintiff responds by noting that her last performance evaluation from January 2001 indicated that she was performing average to above average work. Defendant offers no response to this point in its reply brief. Under the circumstances of this case, the Court finds that Plaintiff has made a sufficient showing that she had been doing satisfactory work reasonably close to the time of her termination.

### d. Reasonable Inference of Unlawful Discrimination

To make a prima facie case, Plaintiff must also show that she was discharged under circumstances that raise a reasonable inference of unlawful discrimination. In her opposition to Defendant's summary judgment motion, Plaintiff argues that "five things highlight the questionable nature" of Qwest's decision to terminate her:

---

[5] Defendant suggests in its opening brief that Plaintiff needs "to produce evidence that she was treated differently than a similarly situated employee not in the protected class" to make a prima facie case of disparate treatment. (Opening Brief at 14). However, some Washington courts have held that this factor is not a necessary requirement in disability discrimination cases. See Callahan v. Walla Walla Housing Authority, 126 Wash. App. 812, 820 n.1, 110 P.3d 782 (2005).

ORDER - 10

> 1) the fact that no one at Qwest considered extending an unpaid leave of absence to Ms. Litaker, even though there was a written policy in the Collective Bargaining Agreement regarding personal unpaid leaves of absence; 2) the fact that no one explained to Ms. Litaker why she could not have an unpaid leave of absence; 3) the inconsistent treatment of Ms. Litaker's "unexcused" absences and whether or not she would be terminated for them; 4) the fact that no intermediate level of discipline was considered – Ms. Litaker was given warnings regarding her attendance, after the onset of her disability, but Qwest skipped straight to termination; and 5) Qwest has given multiple, inconsistent reasons to explain why it could not/would not provide Ms. Litaker an unpaid leave of absence (such leave, if granted, then would have eliminated the need to terminate her).

(Opp. Brief at 18). At oral argument, Plaintiff also pointed to evidence suggesting that Qwest physician Anne Hazelton and Qwest's human resources department knew that she was suffering from mental health problems shortly before she was terminated. (Hawkins Decl. Exs. 9 & 10).

In essence, Plaintiff has introduced evidence that Defendant knew that she was suffering from mental health problems, including information received very shortly before her termination. Plaintiff has also introduced evidence that she was covered by a Collective Bargaining Agreement that generally provided "[i]nsofar as the requirements of the service will permit, leaves of absence for good cause, and of reasonable length, will be granted upon request." (Hawkins Decl., Ex. 14). Mr. Birchler's letter to Plaintiff on June 1, 2001, which informed Plaintiff that "[t]he company is unwilling to grant you a leave of absence," suggests that Plaintiff had requested a leave of absence close in time to her termination. Defendant offers little if any reason in its briefing to explain why the company was unwilling to provide such leave. Under these circumstances, the Court concludes Plaintiff has met her prima facie burden of producing evidence that her termination occurred under circumstances that raise a reasonable inference of unlawful discrimination.

<u>Defendant's Reason for the Termination</u>

Defendant maintains that Plaintiff was terminated for failing to report to work as directed on June 5, 2001. Plaintiff does not dispute that this reason satisfies Defendant's burden of producing a legitimate, non-discriminatory reason for her termination.

ORDER - 11

<u>Plaintiff's Showing of Pretext</u>

Because Defendant has offered a legitimate, non-discriminatory reason for Plaintiff's discharge, the burden shifts back to Plaintiff to produce evidence that the reason advanced by the employer is a pretext for unlawful discrimination. Although the question is close, the Court finds that Plaintiff has produced sufficient evidence to meet her burden.

As noted above, Plaintiff has introduced evidence that Defendant was aware of her mental health problems, including a communication between Dr. Hazelton and Plaintiff's counselor less than two weeks before Plaintiff's termination. In addition, Defendant has not explained in its briefing why the company denied Plaintiff a leave of absence. Plaintiff observes that Mr. Birchler's letter of June 1, 2001 provides no reason why Defendant was unwilling to offer such leave. (Hawkins Decl., Ex. 15). Plaintiff further notes that in Mr. Birchler's deposition (which was not cited by Defendant), he suggested that a leave of absence was denied because no leaves were being granted and there was so much work that people were working overtime. (Hawkins Decl., Ex. 1 at 65:2-8, 67:16-18, 70:1-2). However, Ms. Litaker maintains that at the time of her termination, she was not aware of anyone being allowed to work overtime. (Litaker Decl. ¶ 24).

As Plaintiff notes, "[c]onflicting reasons or evidence rebutting their accuracy or believability are sufficient to create competing inferences" and "[s]uch inconsistencies cannot be resolved at the summary judgment stage." <u>Renz v. Spokane Eye Clinic, P.S.</u>, 114 Wn. App. 611, 621, 60 P.3d 106 (2002). The timing of Plaintiff's termination in this case may also create an inference of pretext. Plaintiff was terminated less than two weeks after Dr. Hazelton was informed by Ms. Elderkin that Plaintiff had "gone to pieces" and was not well enough to work. In light of the short period of time between that conversation and Plaintiff's termination, it could be inferred that concerns about Plaintiff's mental health played a substantial role in Defendant's decision to terminate Plaintiff, rather than to offer her a leave of absence. Therefore, while Plaintiff's evidence of pretext is not particularly

ORDER - 12

strong, the Court finds that Plaintiff has produced – if only by a hairsbreadth – sufficient evidence to avoid summary judgment on her disparate treatment claim.

3.       <u>Defendant's Motion to Strike</u>

Defendant has also moved to strike several statements from a declaration that Ms. Litaker offered in opposition to the summary judgment motion. Specifically, Defendant moves to strike the following statements:

> 1)   "To the best of my recollection, my first request for an unpaid leave of absence, post February 2001, was <u>before</u> I received notice of the need to go to North Carolina." (Litaker Decl. ¶ 20).
>
> 2)   "In early May 2001, I received notice I would have to travel to North Carolina that month for hearings related to the custody of my daughter." (<u>Id.</u> ¶ 19).
>
> 3)   "In this time period (April/May 2001) I asked Steve Birchler for an unpaid leave of absence in order to heal, to collect my self [sic]." (<u>Id.</u> ¶ 17).

Defendant argues that each of these statements listed above should be stricken because they are contradicted by Ms. Litaker's deposition testimony.

Defendant is correct that the first two statements above are not consistent with Ms. Litaker's deposition testimony. At her deposition, Ms. Litaker testified (albeit in a confusing manner) that she received notice that she needed to go to North Carolina on March 5th, and then asked for a leave of absence on March 6th. (Reply Brief at 3). In addition, Ms. Litaker's statement that she received notice "in early May 2001" that she needed to travel to North Carolina for child custody hearings is unquestionably wrong. As noted earlier, she traveled to North Carolina on May 2nd on a plane ticket that she had bought the previous month.

However, it is not necessary for the Court to consider either of the first two statements in ruling on the pending motion. Neither of Plaintiff's claims depend on when she "first requested" a leave of absence, nor is the question of when Ms. Litaker received notice that she needed to travel to North Carolina of any particular relevance for summary judgment purposes. As such, Defendant's request to strike these two statements is denied as moot.

ORDER - 13

1    Plaintiff's third statement – that she requested an unpaid leave of absence from Mr. Birchler in
2  "April/May 2001" – is not necessarily contradicted by Ms. Litaker's deposition testimony, as
3  Defendant suggests. Defendant appears to assume that Plaintiff testified that she only asked for a
4  leave of absence once, in early March 2001. However, Defendant points to no testimony where Ms.
5  Litaker states that she only asked for a leave of absence once. In fact, other evidence in the record
6  suggests that Ms. Litaker may have requested a leave of absence close to the time of her termination in
7  June 2001. In particular, Mr. Birchler's letter of June 1, 2001 to Ms. Litaker states that Qwest "is
8  unwilling to grant you a leave of absence" – a statement that suggests that Ms. Litaker had requested a
9  leave of absence near the time that Mr. Birchler wrote the letter. (Hawkins Decl., Ex. 15).

10   Finally, at oral argument, Defendant suggested that one of Plaintiff's exhibits should be
11 stricken as double hearsay. This exhibit contains the notes of Qwest physician Anne Hazelton
12 regarding her telephone conversation with Pamela Elderkin on May 24, 2001. (Hawkins Decl., Ex. 9).
13 However, Defendant's motion to strike this exhibit was not made in a timely manner under Local Civil
14 Rule 7(g), which provides that "[r]equests to strike material contained in or attached to submissions of
15 opposing parties shall not be presented in a separate motion to strike, but shall instead be included in
16 the responsive brief . . . ." Under this rule, Defendant was required to make its requests to strike in its
17 reply brief, rather than at oral argument. As such, Defendant's request to strike this exhibit is denied
18 as untimely. In any event, the Court notes that there are multiple exceptions to the hearsay rule that
19 may or may not apply here (e.g., the business record exception, statement by an agent of a party-
20 opponent, etc.).

21                                    **Conclusion**

22   Without question, Plaintiff's claims are significantly weakened by testimony indicating that
23 aside from the cost of changing her airplane ticket from North Carolina, there was no other reason
24 why she could not have reported for work on June 5, 2001. However, this case does not begin and
25 end with that testimony. Viewing the evidence in the light most favorable to Plaintiff, the Court finds

ORDER - 14

that Plaintiff has produced sufficient evidence to raise issues of material fact on whether Defendant failed to accommodate her alleged disability.  Plaintiff has also produced evidence that is sufficient to give rise to reasonable, competing inferences on whether unlawful discrimination was a substantial factor in her termination.  Finally, Defendant's efforts to strike Plaintiff's evidence are either untimely, directed at marginally relevant evidence, or unwarranted.  Therefore, Defendant's motion for summary judgment and Defendant's motion to strike are DENIED.

The clerk is directed to provide copies of this order to all counsel of record.

Dated: October 19, 2005

s/Marsha J. Pechman
Marsha J. Pechman
United States District Court

ORDER - 15